UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 05-194 (EGS) |
| | : | |
| v. | : | |
| | : | |
| CHARLES COLLIER | : | |
| | : | |
| Defendant. | | |

**GOVERNMENT'S RESPONSE TO THE DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF MOTION
TO SUPPRESS TANGIBLE EVIDENCE**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Response to the Defendant's Supplemental Memorandum in Support of Motion to Suppress Tangible Evidence. In support of this Response, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing regarding these motions.

**I. BACKGROUND**

While on patrol during a midnight tour on April 24, 2005, Metropolitan Police Department (MPD) Officers received a call to respond to a three-car accident with injuries in the 1600 block of First Street, NW, in the District of Columbia. When the officers arrived, the Defendant, Charles Collier, was standing outside a car whose driver was trapped inside. The Defendant told MPD officers that he had been a passenger in the vehicle. Officers took the Defendant's driver's license and went to check on other victims.

As other emergency equipment arrived, two citizens that were not involved in the accident walked up to Ofc. Eric Hairston and told him that they had seen the Defendant get out of a damaged automobile with a pistol in his hand. They claim to then have seen him put the pistol

in the waistband of his pants. They pointed the Defendant out as "an individual standing over there next to a mailbox" (T. 12, L. 11-12).

Officers then approached the Defendant. When the Defendant came over, Ofc. Hairston told him he was not under arrest, but that he was being handcuffed (T 14, L. 16-18) for both his and officer safety (T 14, L. 24-25). At that point, Ofc. Hairston immediately felt a pistol in the small of the Defendant's back (T. 14, L. 20-21), and placed the Defendant in handcuffs. At the same time, an officer removed a loaded 9mm pistol from the Defendant's waistband (T 15, L. 1-2).

The Defendant has been charged with unlawful possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g). He now moves to suppress the tangible evidence, arguing that the officers had neither reasonable suspicion to stop, nor probable cause to arrest him. The Defendant's motion should be denied in full.

## II. DISCUSSION

A.   **THE TIP FROM THE ANONYMOUS IN-PERSON INFORMANTS WAS SUFFICIENT TO ESTABLISH REASONABLE SUSPICION FOR A TERRY STOP.**

To justify an investigative stop, the police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868 (1968). An anonymous tip, without more, is not sufficient to justify a Terry stop. Davis v. United States, 759 A.2d 665, 670 (D.C.2000); Florida v. J.L., 529 U.S. 266 (2000). However, an anonymous tip can suffice to support a Terry stop if the tip is sufficiently detailed and the police can corroborate the tip to a sufficient degree. Alabama v. White, 496 U.S. 325 (1990). In addition, courts distinguish

between purely anonymous tips, which are frequently given over the telephone, and in-person tips, for which here is a "presumption that a citizen is prima facie a more credible source than a paid police informant." Rushing v. United States, 381 A.2d 252, 255 (D.C.1977). As a general rule, in-person informants who personally observe a criminal occurrence, and describe such an occurrence shortly thereafter to a police officer, are not subject to the same scrutiny as purely anonymous tips, even if these informants do not reveal their names. See Ware v. United States, 672 A.2d 557, 563 (D.C.1996) ( "the fact that the tip was given in person, rather than over the telephone, further strengthens its credibility"); Lawson v. United States, 360 A.2d 38, 40 (D.C.1976) ("The report of an eyewitness is sufficient to provide the basis for further police investigation whether or not the witness is willing to identify himself"). In fact, "if the citizen claims or appears to be a victim of a crime or an eyewitness to a crime, the reliability of his or her information is greatly enhanced." Allen v. United States, 496 A.2d 1046, 1048 (D.C.1985). Here, in the case before the Court the officers received information from two individuals who stated that they both had seen the Defendant put the pistol in the waistband of his pants. The individuals, in the presence of the officers, were able to direct the officer's attention to where the Defendant was located, and the individuals' demeanor, tone of voice, and appearance all reinforced the officer's presumption as to their reliability. See Rushing, 381 A.2d at 255 (D.C.1977)

    In Nixon v. United States, 870 A.2d 100 (2005), a "concerned citizen" flagged down officers and told them that some people were using drugs inside a red pickup truck parked in front of his house. The officers did not know the citizen or have any prior contact with him, nor did the citizen offer his name. Id. at 102. In finding the police officers had reasonable suspicion to justify a Terry stop of the suspect, the District of Columbia Court of Appeals noted that the

citizen was an eyewitness to the crime, the information he provided was given in person so that the officers were able then and there to assess his reliability, and his information was corroborated when the vehicle was spotted in the location stated by the citizen. Id. at 100. In reaching their decision, the court found that the presumption that an in-person informant is prima facie more credible than an anonymous tipster should apply, because in this type of situation the "concerns animating the Supreme Court's decision in Florida v. J.L. have little application." Id. at 104.

In the instant case police acted on "information given to them by citizens about recent or ongoing criminal activity." See Allen, 496 A.2d at 1048. The citizens quietly took a police officer aside at the scene of a recent car accident, and in a hushed voice explained that they had just seen the suspect exit one of the vehicles involved in the accident, and put a pistol in the waistband of his pants. As in Nixon, the citizens were eyewitness to this incident, which they had observed only moments before. Similarly, only a brief amount of time elapsed between the officer's receipt of the information and the time in which the citizens saw the suspect with the weapon. In addition, the officer was in close proximity to the citizens, and readily able to assess their reliability. Finally, the officer was able to corroborate the citizens' assertion that the Defendant has just been in the car accident, because the officer had spoken with the Defendant only moments before, at which time the Defendant indicated that he had been a passenger in the accident vehicle.

The facts in Ware v. United States are also comparable to those of the instant case. 672 A.2d 557 (D.C.1996). The officer in Ware testified that he was on motorcycle patrol when a woman flagged him down and told him that a man on a bicycle, whom she described, was selling cocaine out of a black purse. When the officer asked the woman how she knew the man was

selling drugs, she replied, "He's out there every day selling drugs." Id. at 559. The woman did not identify herself, and the officer never saw her again and never found out who she was. The court sustained the ensuing Terry stop and subsequent arrest of the defendant, who matched the description given by the woman, as well as the seizure of drugs from a container he was carrying. "In Ware we observed that 'when a citizen appears to have personally observed a crime, the reliability of his or her information is greatly enhanced.'" Sanders v. United States, 751 A.2d 952, 955 (D.C.2000). Such is similarly the case here; citizens approached a police officer in person to report an observed crime and thus subjected themselves to future recognition by the officer. As in Ware and Nixon, the citizens alerted the officer to the firearm possession based on their recent personal observations of such possession. As a result, the identifications of the Defendant provided the officers with reasonable suspicion to approach and briefly detain the Defendant.

The Defendant argues that the stop in this case should be impermissible merely because the police were acting due to information gleaned from anonymous sources at the crime scene. In a case factually similar to this case before this Court, the District of Columbia Court of Appeals stated in Lawson v. United States that:

> To hold the stop impermissible prohibits the police from acting upon such reports of serious crime except where a citizen eyewitness identifies himself, or if he desires to remain anonymous, personally seeks out a police cruiser or presents himself at a precinct house to make his report. The opportunity might well evaporate in the delay.

360 A.2d 38, 40 (D.C.1976). Under these circumstances, it is clear that under the law the police officers' actions at the scene were reasonable.

B.   **THE POLICE DID NOT ARREST DEFENDANT BEFORE THEY FRISKED HIM**

This Court need not decide whether suppression would be warranted had Defendant been unlawfully arrested, because the officers did not in fact arrest Defendant until after they found the gun. A lawful stop does not become a full-blown arrest so long as the police officers' actions are "'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Sharpe, 470 U.S. 675, 682 (1985) (quoting Terry, 391 U.S. at 20). Here, the officers acted reasonably in approaching the Defendant and in patting him down, in view of the citizens' tip that he was carrying a handgun on his person. This action was reasonably necessary to thwart Defendant's flight and to protect the officers' safety, and well as that of the surrounding civilians. Moreover, nothing about handcuffing the Defendant while the officers tried to ascertain the veracity of the citizens' complaint necessarily converted the Terry stop into an arrest. It allowed the police to reduce their show of force: handcuffing Defendant obviated the need for the drawn pistols. The police did not invoke any force or threat of force which would cause the Court to question whether the lawful investigative stop and detention was actually an arrest. Therefore, nothing the police did before appellant was identified converted the investigative stop into an arrest; the police action evinced a "more temporary detention, designed to last only until a preliminary investigation either generates probable cause or results in the release of the suspect." In re M.E.B., 638 A.2d 1123, 1126 (1993).

C.   **OFFICERS' CONDUCT IN NOT DRAWING THEIR WEAPONS ON THE DEFENDANT WAS PROPER.**

Terry makes it clear that an officer who has articulable grounds to suspect a crime is in progress may use force to briefly restrain the individual he suspects in order to maintain the status quo until he can obtain additional information and determine exactly what is occurring.

Edwards v. United States, 364 A.2d 1209, 1213 (D.C. 1976); see also United States v. Hensley, 469 U.S. 221, 229 (1985) (police may make investigatory stops when they have articulable suspicion to believe that person they encounter was involved in, or is wanted for, a criminal offense). However, the reasonableness of this police conduct is not assessed in a vacuum. Womack v. United States, 673 A.2d 603, 607 (1996). The evidence must be "weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Id. (quoting United States v. Cortez, 449 U.S. 411, 418 (1981). When courts are called upon to decide whether the force used by an officer to restrain a suspect was reasonable, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-397 (1989). As the Seventh Circuit Court of Appeals stated in United States v. Ocampo, 890 F.2d 1363, 1369 (1989):

> In general, officers may take such steps as are "reasonably necessary to protect their personal safety and to maintain the status quo" so that the limited purposes of the stop may be achieved. United States v. Hensley, 469 U.S. 221 (1985).

This growing trend towards increased deference to police conduct in dangerous and stressful situations has continued through Thornton v. United States, 124 S.Ct. 2127 (2004), where the Supreme Court held that the Fourth Amendment allows an officer to search a vehicle's passenger compartment as a contemporaneous incident of arrest, even when the officer does not make contact until the person arrested has already left the vehicle. The Court explained that its decision was motivated by a concern for officer safety, and with the understanding that, "in some circumstances, it may be safer and more effective for officers to conceal their presence from a suspect until he has left his vehicle. Certainly that is a judgment officers should be free to make."

Id. at 2131. In the instant case, the officers felt that by approaching the Defendant in a calm manner with their weapons concealed, the officers' safety as well as that of the surrounding citizens would be best preserved. While the Defendant may argue that he posed little threat to the approaching officers, the Court has made it clear that "every arrest must be presumed to present a risk of danger to the arresting officer." Id. at 2131 (quoting Washington v. Crisman, 445 U.S. 1,7 (1982). Therefore, the officers conduct in the instant case in not drawing their weapons was proper, and the Court should grant them deference in this regard.

### III. CONCLUSION

The Defendant's Motion to Motion to Suppress Tangible Evidence should be denied because the tip from the anonymous in-person informants was sufficient to establish reasonable suspicion that the Defendant was in illegal possession of a handgun. In addition, the Defendant could not have been unlawfully arrested, because he was not arrested until *after* the officers found the handgun on his person. Finally, the officers' decision not to draw their weapons on the Defendant was proper, given the deference afforded police conduct in such dangerous situations.

In light of the foregoing, the Defendant's Motion should be denied in full.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

_____
CARLOS F. ACOSTA
Special Assistant United States Attorney
Organized Crime and Narcotics Unit
555 4th Street, N.W., Room 4108
Washington, DC 20530
(202) 514-4922